Henry P. MARKLAND, Individually and as next friend for Barbara Sue Markland, a minor child and Betty Markland, Plaintiffs,

v.

The BALTIMORE AND OHIO RAILROAD COMPANY, a corporation of the State of Maryland, et al.

Superior Court of Delaware, New Castle.

Submitted Jan. 2, 1976.

Decided Jan. 20, 1976.

David Roeberg, of Roeberg & Agostini, Wilmington, for plaintiffs.

James T. Perry, of Gallo & Benson, Wilmington, for defendants Anna Marie Troiani and John J. Troiani, Sr.

Wayne N. Elliott and David B. Ripsom, of Prickett, Ward, Burt & Sanders, Wilmington, for defendant The Baltimore and Ohio Railroad Co.

O'HARA, Judge.

Defendants, Anna Marie Troiani and John J. Troiani, Sr. ("Troianis"), in their individual capacity have moved for summary judgment. As in all summary judgment motions, the decision must be based upon a review of the facts viewed in a light most favorable to the party against whom judgment is requested. *Wilson v. Tweed*, Del.Supr., 209 A.2d 899 (1965); *Vanaman v. Milford Memorial Hospital, Inc.*, Del.Supr., 272 A.2d 718 (1970); *Taylor v. Steele*, Del.Super., 266 A.2d 190 (1970).

On the afternoon of April 5, 1972, Barbara Sue Markland ("Barbara"), minor plaintiff, was struck by a motorbike along the southerly side of the defendant, Baltimore & Ohio's ("B & O") railroad tracks, located along the railroad's right-of-way

in the town of Elsmere. At the time Barbara, aged 14, was walking along the railroad tracks with five girlfriends. The route chosen by the girls was not their normal one but was chosen as a short-cut due to being late returning home. The girls walked along in a playful manner occasionally resorting to pushing and shoving in a good-natured way.

At approximately 3:00 P.M., defendant John J. Troiani, Jr. ("John"), 12 years old, was riding his motorbike in the vicinity of the girls. The bike was owned by the Troianis, John's parents. Plaintiffs contend that at the time of the accident John passed the girls and then turned around to head back in the direction from whence he had come, driving in a show-off manner.

As John approached closer to the girls, the jostling which had been intermittently occurring resulted in Barbara falling down partially on the incline between the railroad track and the utility road, or partially on the road itself.

Barbara fell to the ground approximately 40 feet in front of the oncoming motorcycle operated at a speed of 25 to 30 miles per hour and, at the point of impact, between 8 and 18 miles per hour. John apparently attempted to avoid colliding with the victim by turning sideways and braking.

An investigation conducted by Officers McGinnis of the Elsmere Police Force and Pierce of the B & O Security Police did indicate that the point of impact was approximately the middle area of the utility road. In the opinion of Officer McGinnis a speed of 30 miles per hour was a safe speed considering John's prior operating experience as well as the surface of the road.

The B & O gravel lane is a limited access, privately owned area which exists as an access road for railroad maintenance. Unpaved and unimproved, the road is composed of gravel, dirt, and rock and is locat-ed next to the track which is itself upon an embankment of stone. At the area of the accident, the railroad right-of-way consists of one track, two to three feet above the service road adjoining it.

Approximately several hundred feet up the tracks, on the utility road side of the tracks, is a field, privately owned and utilized by those riding motorcycles and mini-bikes. In fact, the entire Troiani family had ridden motorcycles there on various occasions.

In June, 1970, John expressed an interest in learning to ride a motorbike and a neighbor, John S. White, Sr. ("White"), began teaching him to ride a 125 c.c. Yamaha Enduro which he had purchased for his own children. John would accompany White and his children to the field adjacent to the B & O access roadway to ride. On occasion, the Troianis would go along with the children and, now and then, they too would operate the motorbike. White instructed John on the operation, maintenance, and safety of motorcycles, including care of the engine and other parts and the importance of having all of the safety mechanisms such as the brakes and clutch, in good working order. In addition, he insisted that all of the children, including John, wear a helmet while riding. The Troianis were kept apprised of John's progress through conversations with White and through their own interest in observing John at the field.

As John's twelfth birthday approached, the Troianis inquired of White as to their son's readiness and capability to ride and care for a bike of his own. Because John had operated White's Yamaha safely for approximately 1000 miles, White informed the Troianis that, in his judgment, John was an extremely capable rider and had demonstrated good judgment in the operation of the motorbike.

The cycle that was eventually purchased for John was the same model which he had been operating for the past year. Between the time when John was given the bike in

June, 1971, and the accident on April 10, 1972, White continued to observe John operating the bike now and then, and at all times he demonstrated proper judgment in the safe operation and maintenance of the vehicle.

Both White and the Troianis insisted on numerous occasions that the field was the only appropriate place to ride the bike, and John was expressly prohibited from riding on the railroad access roadway adjacent to the field. The Troianis further insisted that John push the bike to the field where he was permitted to ride and likewise when he returned home. As far as the Troianis were aware, John always obeyed these instructions. There were never any complaints received from neighbors, or anyone else for that matter, that John operated the bike in a careless manner or in impermissible areas.

At the time of the accident, John had been operating his own bike for approximately ten months and 1600 miles. In total he had operated a 125 c.c. Enduro bike for a period of 22 months and approximately 2600 miles prior to the time of the accident.

Plaintiffs first allege in their complaint that the Troianis were negligent under the terms of 21 Del.C. § 6106 in that they, "as owners of a 1971 Yamaha motorcycle, furnished it to John J. Troiani, Jr., aged 12". Alternatively, they assert the common law theories of negligent entrustment and incapability of a child, by reason of his youth, to appreciate danger. B & O, in paragraph (4) of its answer asserts a crossclaim against the Troianis by adopting the allegations of negligence in the complaint. For reasons which are not here relevant, plaintiffs have chosen not to oppose this motion for partial summary judgment.

■ It is well settled at common law that the mere relationship of parent-child imposed no liability on the parent for the torts of his minor child. Prosser, Law of Torts, § 117. Due to the normal lack of financial responsibility of children, how-ever, various means of holding a parent liable for his child's torts have been adopted. One such way is the "family use doctrine", a fiction adopted in some states as an extension of principal-agent theory. That doctrine provides that the owner of an automobile purchased and maintained for the use and pleasure of himself and family, is liable to third persons for injuries sustained through the negligent operation of the automobile by a family member. *Rovin v. Connelly*, Del.Super., 291 A. 2d 291 (1972).

■ The family use doctrine has been explicitly rejected in Delaware. *Smith v. Callahan*, Del.Supr., 4 W.W.Harr. 129, 144 A. 46 (1928); *Bastian v. Cannon*, Del.Super., 1 W.W.Harr. 533, 116 A. 209 (1922). Instead, the Delaware legislature has statutorily provided for the liability of a parent who owns a motor vehicle which causes injury when driven on a highway in a negligent manner by his child who is under the age of 18. Title 21, Del.C. § 6106 provides:

"Every owner of a motor vehicle who causes or knowingly permits a minor under the age of 18 years to drive such vehicle upon a highway, and any person who gives or furnishes a motor vehicle to such minor, shall be jointly and severally liable with such minor for any damages caused by the negligence of such minor in driving such vehicle, and the negligence of such minor shall be imputed to such owner or such person for all purposes of civil damages."

The entire scheme of Title 21 makes it clear that § 6106 only applies to owners and/or persons who furnish a motor vehicle to a minor for use *upon a highway*. The statute is strictly a "highway" statute and intended to apply only to incidents which occur while a vehicle is being operated upon a highway within the State. In fact, 21 Del.C. § 4101 provides in part:

"(a) The provisions of this title relating to the operation of vehicles refer exclusively to the operation of vehicles *upon highways* . . ." (Emphasis supplied).

The definition of "highway" is found in 21 Del.C. § 101 as follows:

"'Highway' means the entire width between boundary lines of every way or place of whatever nature open to the use of the public as a matter of right for purposes of vehicular travel, but does not include a road or driveway upon grounds owned by private persons, colleges, universities or other institutions."

Clearly, as defined in Title 21, a highway is not a proper description of the area in which John was driving at the time of the accident. In fact, the individuals who were either walking or riding on the railroad access road were actually trespassing. The road was clearly not "open to the use of the public as a matter of right".

It is further contended that § 6106 is so worded that it also deals with liability for any person who gives or furnishes a motor vehicle to a minor without reference to its operation upon a highway. While the statutes does not expressly limit the second phrase of the statute to use on a highway by deliberately repeating the phrase, "upon a highway", a logical and reasonable interpretation of the section would impose that condition throughout the statute, particularly if one considers the purpose of the law. Moreover, to permit a construction such as urged by B & O would create a different standard of liability for "owners" than for "other persons" who allow minors to have access to motor vehicles. The distinction B & O seeks to create is that "an owner" who "causes or knowingly permits" a minor to drive can only be held liable if the vehicle is driven upon a highway but "any person" who "furnishes" a vehicle to a minor can be held whether the vehicle is operated on a public highway or a private drive. Such a distinction is neither logical nor reasonable in light of the statutory scheme of Title 21. The intention of the General Assembly would seem more likely to have been to impose liability for *highway* driving regardless of the status of the person who furnishes the vehicle to a minor.

Under the doctrine of negligent entrustment one is liable for the negligent acts of a minor to whom a motor vehicle is supplied when the supplier knew or should have known that, because of youth, inexperience, or other reason, the motor vehicle might be used in a manner involving unreasonable risk of physical harm to the minor or others. See Restatement Second, Torts, § 390; 8 Am.Jur.2d, "Automobiles and Highway Traffic", § 573. The doctrine has been accepted in Delaware. *Smith v. Callahan*, supra.

Having carefully reviewed the facts here in the light most favorable to plaintiffs (and to defendant B & O on its cross-claim), the Court is persuaded that the Troianis are entitled to judgment as a matter of law since there is absolutely nothing in the record from which a jury could reasonably conclude that they knew or should have known that their son would disobey them and drive in a forbidden area, in a careless manner so as to cause bodily injury.

The Troianis cite the Wisconsin case of *Hopkins v. Droppers*, 191 Wis. 334, 210 N. W. 684 (1926) as support for their contentions and the facts are indeed similar to those of the case at bar. There, the plaintiff was injured while riding on the back of a motorcycle operated by a fifteen year old. The defendant had operated the cycle several times since its purchase with the permission of his father. The night prior to the accident, the defendant-father had expressly instructed the son not to use the motorcycle in violation of a statute forbidding its use by one under the age of sixteen, if unaccompanied by an adult. The plaintiff obtained a judgment against both the minor and his father. On appeal, the Wisconsin Supreme Court reversed the judgment as to the father stating:

"The law cannot require that the motorcycle should be entirely removed from the possession and control of a minor under the age of 16 because the law recognizes a permissible use of the machine by such minor; much less could there be

any requirement that, at least, in the absence of a showing that the son was a known contemnor of parental authority (a situation not now before us), there should be any thought of physical restraint of the son in anticipation of a possible intentional violation of such commands; neither can it reasonably require a parent to anticipate a forgetfulness or intentional disobedience of such a partial restriction of the use of even such a tempting article as a motorcycle, and therefore keep it under lock and key subject to be released only upon express parental consent and knowledge."

Turning to the facts of the instant case, there is nothing to show knowledge on the part of the Troianis that John was an incompetent driver for, in fact, he was not. John had 2600 accident-free miles in 22 months of operation. The Troianis had instructed him frequently not to operate the bike on the roadways and to walk back and forth from the field. There were never any complaints received concerning John's operation of the vehicle. Besides a year of supervised instruction John was continually supervised subsequent to his receipt of his own bike and there is nothing whatsoever in the record which would indicate to the parents any lack of ability on John's part. Short of accompanying him on each and every excursion, and short of physically restraining him at all times to assure that he would not disobey, there was nothing further which the parents could do to prevent the injury which occurred. It would certainly be an unreasonable duty to require such behavior on the part of the Troianis, or to expect them to anticipate every disobedience of a son who, prior to the accident, never disregarded their express instructions. It would be unreasonable for the parents to assume that John did not have an understanding and recognition of the potential for danger in his use of the bike.

Although B & O asserts that this type of factual negligence issue is not generally susceptible to summary judgment adjudication, this case is clearly an exception. Since there appears to be no genuine issue of fact for the jury as to the negligence of defendants, Anna Marie and John J. Troiani, Sr., they are, therefore, entitled to judgment as a matter of law. Defendants' motion for partial summary judgment is hereby granted.

It is so ordered.